**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TRUMP MEDIA & TECHNOLOGY
GROUP CORP.,

      Plaintiff,

v.                                     Case No. 8:23-cv-1535-TPB-AAS

WP COMPANY LLC,

      Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

This matter is before the Court on "Defendant WP Co. LLC d/b/a The

Washington Post's Motion for Summary Judgment and Incorporated Memorandum of

Law" (Doc. 211) and "Plaintiff's Motion for Partial Summary Judgment and

Incorporated Memorandum of Law" (Doc. 218-1), filed on April 24, 2026.  Each party

filed a response in opposition to the opposing party's motion, and a reply in support of

its own motion.  (Docs. 235-1; 236-1; 247; 248-1).  Upon review of the motions,

responses, replies, court file, and record, the Court finds as follows:

## Introduction

In 2023, Defendant WP Company LLC (the "Post") published an article titled

"Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social," which

reported on the finances of Trump Media Technology Group ("TMTG").  After almost

three years of litigation, the Post has now admitted that portions of the article included

false information.  Specifically, the Post admits its story incorrectly stated that TMTG

paid a $240,000 referral fee in connection with an $8 million loan from an entity known as ES Family Trust.   The Post now admits that no such payment was made and recently chose to publish a "Correction" to that effect.[1]  TMTG contends in this defamation lawsuit that the statements about the referral fee were false and defamatory and seeks almost $2 billion in damages resulting from the publication.

However, under controlling United States Supreme Court and Eleventh Circuit precedent following *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), a jury will not have the opportunity to decide this case.  To survive summary judgment, TMTG must show more than just that the Post's statements were false and defamatory.  Current law requires that TMTG also establish that the Post acted with "*actual malice*," that is, TMTG must prove that, at the time the Post published the statements, the Post either actually knew the statements were false or had serious doubt as to whether they were true or false.  Further, to prevail under current law, TMTG must establish actual malice by evidence that goes beyond the "preponderance of the evidence" necessary in the usual civil case and adduce evidence on this issue that is *clear and convincing.*

These standards are exceedingly difficult for any plaintiff to meet, and TMTG has not met them here.  TMTG's evidence establishes beyond any doubt whatsoever that the Post published false information – the Post has admitted that.  Under the facts presented here, reasonable minds could certainly conclude the Post acted unreasonably and should have conducted a better investigation before making the challenged

---

[1] *See Correction*, Washington Post, May 22, 2026 (Doc. 248-2) ("Discovery in the ongoing litigation has established that Trump Media didn't pay a loan referral fee of $240,000, as was stated in the article and was based on The Post's reporting at the time of publication.")

statements.  But under controlling precedent, such a showing is not sufficient to establish actual malice by clear and convincing evidence.  Accordingly, the Court is required to grant summary judgment for the Post.

## Background

This lawsuit for defamation by TMTG[2] against the Post arises from an article titled "Trust linked to porn-friendly bank could gain a stake in Trump's Truth Social," published by the Post on May 13, 2023.  The article described events related to a contemplated merger between TMTG and Digital World Acquisition Corp. ("DWAC") as part of taking TMTG's "Truth Social" business public.  The article noted there had been a delay in obtaining SEC approval for the merger, which supporters of (then) former President Donald Trump and TMTG attributed to political bias.  The article offered an alternative explanation for the delay: concerns over a loan or loans obtained by TMTG, the identities of the lenders, and whether those loans had been properly disclosed by DWAC in its public filings.  The article cited various sources for its story, including "internal documents a company whistleblower has shared with federal investigators and [the Post]" and statements expressly attributed to the whistleblower, former TMTG officer Will Wilkerson.

The article related that in late 2021, with the proposed merger "frozen" and TMTG concerned about paying its bills, DWAC CEO Patrick Orlando announced that he had arranged for $8 million in loans from an entity known as "ES Family Trust." According to the article, the loans were part of a deal in which TMTG would receive the

---

[2]  The Post asserts that the name of Plaintiff following the merger is "TMTG Sub, Inc." and Plaintiff does not appear to disagree.  For convenience, the court will continue to refer to Plaintiff as "Plaintiff" or as " TMTG."

loans, and in exchange, ES Family Trust would acquire an equity interest in the public entity to be formed from the merger of TMTG and DWAC. This loan-for-stock deal was reflected, according to the article, in a convertible promissory note, although the article acknowledged that the only copy of the note the Post had been able to locate was unsigned. The article also reported that some of the funds were wired by another entity, Paxum Bank, which had ties to ES Family Trust and to the adult film industry. Of particular importance here, the article reported that TMTG paid a finder's fee of $240,000 in connection with the loans to Entoro Securities, a Texas entity, of which Orlando was a managing director.

The article stated that neither the loan-for-stock deal nor the finder's fee had been disclosed to shareholders of DWAC or the SEC, and that New York University law professor Michael Ohlrogge opined that the deal was "unusual and rife with questionable decisions and potential conflicts of interest," that these issues could affect the value of the shares, and that they should have been disclosed. The article also noted that the British journal *The Guardian* had earlier reported that federal prosecutors in New York were investigating whether TMTG violated money laundering statutes in connection with these loans, and that TMTG Chief Executive Officer Devin Nunes filed a lawsuit against Wilkerson and others (including *The Guardian*) asserting that *The Guardian* story was "fabricated."

TMTG's original complaint alleged that nine separate statements in the article relating to the ES Family Trust loan deal, the finder's fee, and the money-laundering investigation were false and defamatory. The Court dismissed TMTG's original complaint and dismissed an amended complaint for failure to state a claim on which

relief can be granted.  The Court allowed TMTG to amend its pleadings, and TMTG's second amended complaint narrowed its defamation claim to two statements from the Post's article relating to the purported finder's fee that TMTG alleged were false and defamatory.  Those statements are:

1.   "The companies also have not disclosed to shareholders or the SEC that Trump Media paid a $240,000 finder's fee for helping to arrange the $8 million loan deal with ES Family Trust"; and

2.   "The recipient of that fee was an outside brokerage associated with Patrick Orlando, then Digital World's CEO[.]"

The Post moved to dismiss the second amended complaint, arguing among other things that TMTG had failed to plead facts showing the statements were made with "actual malice" as required by *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), that is, with knowledge they were false or with reckless disregard of whether they were false.  The Court denied the Post's motion to dismiss the second amended complaint, concluding that TMTG's allegations "nudged" its claims over the line from conceivable to plausible, which is sufficient at the pleading stage.

The Post moved for summary judgment, arguing that TMTG has not come forward with evidence sufficient to allow a jury to conclude, under the clear and convincing evidence standard, that the Post acted with actual malice.  TMTG moved for partial summary judgment on various liability issues.   On July 2, 2026, the Court entered an endorsed order granting the Post's motion for summary judgment and denying TMTG's motion.  (Doc. 255).  This Order provides further detail and explanation for that ruling.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A properly supported motion for summary judgment is not defeated by the existence of a factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Only the existence of a genuine issue of material fact will preclude summary judgment. *Id.*

The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

Where the party moving for summary judgment does not bear the burden of proof at trial, it may satisfy its initial summary judgment burden by pointing out that there is an absence of evidence in the record to support a judgment for the opposing party on the claim or defense the moving party attacks. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993). Where the moving party will bear the burden of proof on an issue at trial, demonstrating the absence of a genuine issue of material fact

requires the submission of credible evidence that, if not controverted at trial, would entitle the moving party to a directed verdict. *Id.*

In deciding whether a genuine issue of material fact exists at the summary judgment stage, the district court must be guided by the substantive standard that will apply at trial. *See Anderson*, 477 U.S. at 255-56. Accordingly, where a plaintiff will be required at trial to prove an issue by "clear and convincing" evidence, the "appropriate summary judgment question" is whether the record evidence could support a reasonable jury in finding that the plaintiff has proven the issue by clear and convincing evidence. *Id.* at 255-56

The standard for cross-motions for summary judgment is not different from the standard applied when only one party moves for summary judgment. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion separately, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).

## <u>Analysis</u>

The general principles of law governing defamation claims are discussed in the Court's prior orders on the Post's motions to dismiss, and that discussion is incorporated here by reference. *See, e.g., Trump Media & Tech. Grp. Corp. v. WP Co.*

*LLC*, 720 F. Supp. 3d 1203, 1208 (M.D. Fla. 2024). TMTG has not seriously disputed its status as a public figure. As such, the Post's arguments for summary judgment focus on the issue of actual malice.

### *The Actual Malice Standard*

The Post's article reported that TMTG paid a finder's fee in connection with the ES Family Trust loan to Entoro Securities, a company with which DWAC CEO Patrick Orlando was affiliated, based on Orlando's obtaining the loan for TMTG. It is now undisputed that the Post got that wrong. As the Post admits in its very, very belated "Correction" to the article, discovery in this case "has established that Trump Media didn't pay a loan referral fee of $240,000, as was stated in the article[.]" And because no fee was paid, there was no "failure" to report the fee to shareholders or the authorities as the article had reported.

TMTG, however, as a public figure, is required to prove not only that the challenged statements were false but also that the Post (through its employees who worked on the story, principally reporter Drew Harwell and editor Mark Seibel), published the statements with "actual malice," that is, with actual knowledge that the statements were false or with reckless disregard of whether they were false. *See Michel v. NYP Holdings, Inc.,* 816 F.3d 686, 702 (11th Cir. 2016) (quoting *Sullivan*, 376 U.S. at 280).

The test for actual malice "is not an objective one and the beliefs or actions of a reasonable person are irrelevant." *Michel*, 816 F.3d at 702-03. Rather, the test is subjective: "we ask whether the defendant, instead of acting in good faith, *actually* entertained serious doubts as to the veracity of the published account, or was highly

aware that the account was probably false." *Id.* at 703 (emphasis supplied); *Dershowitz v. Cable News Network, Inc.,* 153 F.4th 1189, 1193 (11th Cir. 2025) ("[A]ll that matters are the speakers' subjective beliefs about the truth of their own statements.").

Of course, absent an admission by the defendant, a plaintiff will rarely have direct evidence of the defendant's subjective mental state, and actual malice may be proven with circumstantial evidence. *Harte-Hanks Commc'ns, Inc. v Connaughton*, 491 U.S. 657, 668 (1989). Such evidence may include a combination of factors such as the inherent improbability of the defamatory claim, reason to doubt the veracity or reliability of the source, the lack of any attempt to corroborate or refute a questionable claim by consulting the most obvious sources, and the defendant's awareness of "other credible information contradicting the claim." *See, e.g., Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983) (holding that actual malice may be inferred from circumstances such as improbable allegations and reliance on anonymous or other questionable sources).

Nevertheless, the evidence must be sufficient to show more than that the defendant was negligent in publishing the statement. *See Dershowitz*, 153 F.4th at 1193 (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991)). Courts regularly recognize that evidence showing that a defendant conducted a shoddy investigation is insufficient. *See, e.g.*, *Harte-Hanks*, 491 U.S. at 688 ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."); *Scheindlin v. Accelerate 360, LLC*, No. 2:24-CV-553-KCD-NPM, 2026 WL 1026855, at *4 (M.D. Fla. Apr. 16, 2026) ("[C]rappy journalism does not equal actual malice."). "Actual malice requires more

than a departure from reasonable journalistic standards.  Thus, a failure to investigate, standing on its own, does not indicate the presence of actual malice[.]" *Michel*, 816 F.3d at 703 (citations omitted).  Rather, in order to raise an inference of actual malice, the evidence must show the defendant "purposefully avoided further investigation with the intent to avoid the truth."  *Id.* (citations omitted).

### *The Requirement of Clear and Convincing Evidence*

A public figure defamation plaintiff must not only prove actual malice at trial but must also do so under the clear and convincing evidence standard, rather than the more lenient preponderance of the evidence standard applicable in the usual civil case.  Therefore, to defeat the Post's motion for summary judgment and demonstrate a genuine issue for trial, TMTG must point to clear and convincing evidence that the Post acted with actual malice.  *See, e.g.*, *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1498 (11th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).  In other words, to avoid summary judgment, TMTG's evidence must be "sufficient to satisfy the court that a genuine issue of material fact exists which would allow a jury to find by clear and convincing evidence the existence of actual malice on the part of the defendant" under the standards set forth above.  *See Block v. Matesic*, 789 F. Supp. 3d 1131, 1169 (S.D. Fla. 2025) (quoting *Dockery v. Fla. Democratic Party*, 799 So. 2d 291, 294 (Fla. 2d DCA 2001)).

While not impossible to satisfy, the clear and convincing standard has been described as "heavy," as "daunting," as involving a "high standard of proof," and as "significantly more onerous" than the preponderance of the evidence standard.  *Veritas v. Cable News Network, Inc.*, 121 F.4th 1267, 1283 (11th Cir. 2024); *Block*, 789 F. Supp.

3d at 1169-70.  The standard requires that the plaintiff's evidence render the existence of actual malice not only possible, or even probable, but *highly* probable.  *See Moore v. Cecil*, 174 F.4th 862, 879 (11th Cir. 2026).  The evidence must "be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established."  *Friedman v. Schiano*, 777 F. App'x 324, 331 (11th Cir. 2019) (quoting *Slomowitz v. Walker*, 429 So. 2d 797, 800 (Fla. 4th DCA 1983)); *Block*, 789 F. Supp. 3d at 1170.  It must be sufficient to "instantly [tilt] the evidentiary scales in the affirmative when weighed against" the opposing evidence.  *Colorado v. New Mexico*, 467 U.S. 310, 315-16 (1984).

The Court's task therefore is to determine, based on its independent review of the record as a whole, "whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of actual malice."  *See Moore*, 174 F.4th at 879 (quoting *Harte-Hanks*, 491 U.S. at 686).  Whether the record would support a finding of actual malice by a reasonable jury presents a question of law for the Court.  *See id*.

### The Evidence in this Case

When assessed under these standards, the Court concludes based on the record that TMTG's evidence fails to cross the "constitutional threshold."  The circumstantial evidence adduced by TMTG certainly supports a jury finding that the Post acted unreasonably and should have done a more thorough investigation into the alleged payment of the finder's fee.  But it falls short of providing a basis for a jury finding that the evidence clearly and convincingly shows that the Post knew the story was false or published it with reckless disregard of whether it was false, that is, with serious doubt

as to whether the story was true or false or with a high degree of awareness that the story was probably false.

**First**, there is no evidence that the Post fabricated the story that TMTG paid a finder's fee, nor is there anything inherently implausible or even extraordinary about the story itself. *See Michel*, 816 F.3d at 705 (affirming dismissal of defamation complaint, explaining that no facts alleged in the complaint indicated that the challenged statement was "fabricated by the defendants [or] wholly imaginary").

**Second**, the Post did not rely on anonymous tips, rumors, or other manifestly unreliable sources as is sometimes the case. It relied on information received from Wilkerson, an insider in position to know the truth, who was willing to go on the record, and who was providing information not only to the Post but also to other newspapers and government officials. The Post also relied on information from Wilkerson's lawyers, whom the Post understood to be providing information on behalf of Wilkerson. *See id.* (affirming dismissal of defamation complaint where the story was not based on an unverified anonymous phone call).

Harwell's declaration asserts that Wilkerson's lawyers told him that TMTG paid the fee. His contemporaneous notes confirm that assertion, as does a recording of an interview session involving not only the lawyers but Wilkerson himself. TMTG does not dispute Harwell's assertions. Although Wilkerson's deposition testimony might be slightly inconsistent with Harwell's declaration and raise an issue of fact as to whether Wilkerson himself actually told Harwell that TMTG paid the fee, Wilkerson does not deny that his lawyers did so.[3]

---

[3] Wilkerson did not squarely testify that he never told Harwell that the fee had been paid. At one point, he testified that he was the source of the Post's information about payment of the

TMTG argues that Wilkerson was an unreliable source because TMTG suspended and then fired Wilkerson, giving him a motive to fabricate the story in retaliation.  As the Court has previously observed, an employee's termination does not necessarily cast doubt on negative information the employee provides about an employer.  *See Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020) (holding that facts that might undermine a source's credibility "do not show that a publisher necessarily acted with malice by relying on the source"); *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 92-93 (S.D.N.Y. 1980) (noting that there was no evidence that the defendant's "sources, even if biased, would necessarily provide false information").

Further,  it is undisputed that Wilkerson did not "blow the whistle" after he had been fired.  He was fired *for* "blowing the whistle," *i.e.*, for providing information to the press.  Harwell's declaration explains that he assessed Wilkerson's credibility and concluded based on past experience with Wilkerson that Wilkerson was reliable.  No record evidence casts doubt on that assertion.

**Third**, the Post investigated the story by reviewing documents provided by Wilkerson and his lawyers, including a draft fee agreement and an invoice for the fee apparently from Entoro Securities.  These documents are fully consistent with the assertion by Wilkerson's lawyers that TMTG paid the fee although they do not directly confirm it.  They certainly do not contradict it.  Harwell can be faulted for not pressing to obtain final documents or additional confirmation, but there is no evidence that

---

$240,000 fee and that, from his perspective, the fee was paid, "so I think that's what I relayed to [Harwell]."  At another point, he testified that, when he left TMTG, he did not understand that the fee had been paid, and that he would not have told Harwell something that was untrue; and in other places he testified that he could not "recall specifically" whether he talked to Harwell about whether the fee was paid.

anyone or any document told Harwell the fee had not been paid.  In the absence of an obvious reason to doubt the story, Harwell's failure to seek additional confirmation does not suggest that he actually doubted the fee had been paid and purposefully sought to avoid the truth.  *Cf. Harte-Hanks*, 491 U.S. at 682-83 (affirming jury verdict for defamation where a local paper published an account of a conversation involving a judicial candidate that six witnesses denied had occurred as reported, while declining to pursue critical evidence that might have confirmed or disproved it).

**Fourth**, prior to publishing, and consistent with his usual practice, Harwell sent to TMTG and others what the Post refers to as "no surprises" emails.  These are sent to provide the subjects of an article an overview of information that may be included in the article, to give the subjects notice and a chance to comment or provide additional information.  Harwell reached out to a number of different sources that included TMTG itself, TMTG CEO Devin Nunes, TMTG co-founders Wes Moss and Andy Litinsky, DWAC CEO Patrick Orlando, Entoro partner James Row, and the SEC. None responded with any information.

TMTG criticizes Harwell's "no surprises" email on the ground that it referred only to the fee agreement rather than to *payment* of the fee, but the email's express reference to the fee agreement and to "Entoro's referral fee" is not what one would expect if the Post were trying to avoid the truth about the fee.  If, as TMTG claims, the payment, not the agreement, is the critical fact, the Post's "no surprises" email could be expected to elicit an explanation from TMTG that, regardless of any agreement, the fee had not been paid.  The notion that the reference to the fee agreement in the "no

surprises" emails was intended to distract attention from the subject of payment of the fee is speculative and insufficient to create a genuine issue of fact.

TMTG also argues that the Post sought confirmation from sources that it expected would not respond. While government agencies might be expected to decline comment on ongoing cases or investigations, that is not true of the many other sources noted above to whom the Post reached out.

TMTG argues that actual malice is demonstrated by the fact that the Post learned within a few days after publication that its own sources lacked proof of payment but did not issue a correction. But the crucial inquiry for actual malice is the Post's state of mind at the time of publication. Assuming the Post's failure to correct the story immediately upon learning that Wilkerson had no knowledge that payment had been made is relevant at all to the Post's knowledge and state of mind at the time of publication, any inference from these post-publication facts to actual malice at the time of publication is speculative at best. *See Block*, 789 F. Supp. 3d at 1179 (treating a refusal to retract as "rather weak" evidence of actual malice and noting that "the 'probative value' of a refusal to retract 'as to a defendant's state of mind at the time of publication is dubious at best'") (quoting *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013)).

TMTG further argues that actual malice can be inferred from Harwell telling Professor Ohlrogge, an expert at New York University Law School that he consulted while developing the story, about an agreement to pay the fee but failing to inform him that the document the Post relied on as evidence of the agreement was an unsigned draft. However, Harwell stated in his declaration that he sent a copy of the draft

agreement to Ohlrogge, and in any event, telling Ohlrogge there was an agreement or payment is perfectly consistent with Harwell's belief that there was an agreement and payment; it is hardly evidence that Harwell knew or doubted those things were true.

In short, a source who was in a position to know the truth and was not obviously unreliable told the Post that TMTG paid a finder's fee for the ES Family Trust loan. The idea that TMTG would pay such a fee is not inherently implausible. The source provided the Post with documents consistent with the assertion of payment although not directly confirming it. No person or document contradicted what the Post had been told. The Post reached out prior to publication to numerous sources, but none provided contrary information.

TMTG's evidence raises an issue of fact on whether the Post acted unreasonably in failing to push for more information. However, based on the Court's independent review of the record, the evidence TMTG points to, taken individually and collectively, falls short of providing a basis for a jury to find clear and convincing evidence of actual malice, that is, evidence that the Post had serious doubts about the truth of the statements that the fee had been paid to Entoro or was highly aware that it was probably false. Accordingly, the Court is required to grant summary judgment for the Post and against TMTG on TMTG's defamation claim.

### *TMTG's Conspiracy Claim*

TMTG's second amended complaint alleges a second count for conspiracy to injure TMTG by publishing false and defamatory statements. Because a claim for civil conspiracy requires an underlying tort and TMTG's defamation claim fails, its claim for conspiracy based on defamation also fails. *See, e.g.*, *Corsi v. Newsmax Media, Inc.*,

519 F. Supp. 3d 1110, 1120 & n.6 (S.D. Fla. 2021) ("Lastly, even if Corsi had properly pleaded the alleged conspiracy, a conspiracy to defame claim cannot stand where, as here, the defamation action fails.  There being no defamation – the gist of the defamation conspiracy – there can be no conspiracy claim.").

***TMTG's Motion for Partial Summary Judgment***

TMTG has moved for partial summary judgment seeking a ruling that the Post published the statements about payment of the finder's fee, that the statements were false and defamatory, and that they were published with actual malice.  TMTG also seeks summary judgment on certain of the Post's affirmative defenses to TMTG's claims.  Because TMTG cannot prove actual malice, a necessary element of its claims, TMTG's other contentions are irrelevant, as are the Post's affirmative defenses.  The Court therefore denies TMTG's motion for partial summary judgment in light of the summary judgment ruling for the Post on actual malice.

### Conclusion

The evidence in this case could certainly lead reasonable people to conclude that the Post's investigation and reporting on the issue discussed above was sloppy and inadequate.  And as a result, the Post published a story that included false information that, nearly three years into this litigation, it had to "correct."  Nonetheless, as the law currently stands, a public figure plaintiff must come forward with clear and convincing evidence of actual malice before the case may proceed to a jury trial.  Under these twin requirements, there is no doubt that it is extremely difficult for a public figure plaintiff to bring a successful defamation claim against a media defendant.

Although it is rooted in the First Amendment, which was adopted in 1791, the law applicable here was essentially invented by the U.S. Supreme Court in 1964 when it decided *New York Times v. Sullivan.* "Since 1964, however, our Nation's media landscape has shifted in ways few could have foreseen." *Berisha v. Lawson*, 141 S. Ct. 2424, 2427 (2021) (Gorsuch, J., dissenting from denial of certiorari). Numerous justices, judges, and commentators have suggested that the law in this area needs to be revisited.[4] In the words of Justice Gorsuch, "given the momentous changes in the Nation's media landscape since 1964, I cannot help but think the Court would profit from returning its attention . . . to a field so vital to the 'safe deposit' of our liberties." *Id.* at 2430.

Very recently, Judge Barbara Lagoa of the Eleventh Circuit concurred in a panel decision affirming summary judgment for CNN in a defamation case brought against the network by Harvard Law School professor emeritus Alan Dershowitz. *See Dershowitz*, 153 F.4th at 1197-1206 (Lagoa, J. concurring). The majority opinion, as is the situation presented here, turned on the absence of evidence of actual malice. Judge Lagoa wrote separately to criticize the actual malice standard of *Sullivan* and to suggest the Supreme Court should reconsider it. *See id.* Her concurring opinion focused on the historical understanding of the scope and recognized limits on the

---

[4] *See, e.g.*, *Berisha* 141 S. Ct. at 2424-30 (separate dissents from denial of certiorari by Justices Thomas and Gorsuch); Cass R. Sunstein, *Falsehoods and the First Amendment*, 33 Harv. J.L. & Tech. 387, 389, 396 (2020) (arguing that *Sullivan* "badly overshot the mark" and "looks increasingly anachronistic, a bit of a dinosaur in light of what is happening online and improved understandings about how information spreads"); Benjamin Barron, *A Proposal to Rescue New York Times v. Sullivan by Promoting A Responsible Press*, 57 Am. U.L. Rev. 73, 76 (2007) (noting criticism that the actual malice standard, among other things, tends to encourage irresponsible journalism).

natural right of free speech prevailing at the time of the ratification of the Constitution, at the ratification of the Fourteenth Amendment, and for another century thereafter until upended by *Sullivan*'s creation of the actual malice standard, *see id.* at 1197-1206, a standard which in Judge Lagoa's view "'has *no* relation to the text, history, or structure of the Constitution.'" *Id.* at 1197 (quoting *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 251 (D.C. Cir. 2012) (Silberman, J., dissenting in part)). In her view, *Sullivan* and its progeny "are policy-driven decisions dressed up as constitutional law[.]" *Id.* at 1198.[5] She also took issue with the balance struck by *Sullivan*, reasoning that the right to speak and publish is protected in order to ensure the public has adequate information about the government and its representatives, but that interest is not served by protecting false statements. *See id.* at 1200.

This Court shares many of Judge Lagoa's concerns, and if it were deciding this case on a clean slate, the result might be different. If the law did not require "*clear and convincing evidence*" of actual malice, it is likely the Post's motion for summary judgment would have been denied, and a jury would have had the opportunity to weigh in on this matter. However, "until the Supreme Court reconsiders *Sullivan*, we are bound by it[.]" *Id.* at 1206. As explained above, under controlling law, TMTG's

---

[5] Judge Charles Wilson also separately concurred but expressed "reservations about suggestions that the Supreme Court should reconsider [*Sullivan*.]" *Id.* at 1207 (Wilson, J., concurring). Judge Wilson reasoned that, while "our understanding of the First Amendment should be guided by its original meaning and heed common law traditions," nevertheless, in his view, "ambiguous historical evidence [did] not justify casting aside a unanimous Supreme Court decision and nearly sixty years of settled precedent[,]" and the "real-world consequences and reliance interests at stake counsel us to pump the brakes before calling to overrule *Sullivan*." *Id.* (citations omitted).

evidence is insufficient to support a finding of actual malice under the clear and convincing standard, and summary judgment for the Post is therefore required.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

1. "Defendant WP Co. LLC d/b/a The Washington Post's Motion for Summary Judgment" (Doc. 211) is **GRANTED**.

2. "Plaintiff's Motion for Partial Summary Judgment" (Doc. 218-1) is **DENIED**.

3. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.

4. Following entry of judgment, the Clerk is directed to terminate any pending motions and deadlines and thereafter close this case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 16th day of July, 2026.

_____
TOM BARBER
UNITED STATES DISTRICT JUDGE